UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

**EVANGELIA FALGOUT**

**VERSUS**

**U S COMMISSIONER OF SOCIAL SECURITY**

**CASE NO.  6:24-CV-00534**

**JUDGE ROBERT R. SUMMERHAYS**

**MAGISTRATE JUDGE CAROL B. WHITEHURST**

### REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the Court recommends that the Commissioner's decision be reversed and remanded for further administrative action.

### Administrative Proceedings

Claimant, Evangelia Falgout, fully exhausted her administrative remedies before filing this action in federal court. She filed an application for child's disability income benefits and an application for supplemental security income benefits, alleging disability beginning on January 15, 2015, when she was twelve years old. (Rec. Doc. 6-1, p. 203). Her application was denied. She then requested a hearing, which was held on October 10, 2023, before Administrative Law Judge Robert Grant. (Rec. Doc. 6-1, p. 41). The ALJ issued a decision on January 5, 2024, concluding that Claimant was not disabled within the meaning of the Social Security

Act from the claimed disability onset date through the date of the decision. (Rec. Doc. 6-1, p. 16-28). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 6-1, p. 7). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on August 8, 2022. She was twelve years old on the alleged disability onset date and twenty-one years old at the time of the ALJ's decision. She has a ninth-grade education and lives with her parents and a sibling. (Rec. Doc. 6-1, p. 49). She has never worked. (Rec. Doc. 6-1, p. 49). She alleged that she has been disabled since January 2015, due to postural orthostatic tachycardia syndrome (POTS), which she alleges causes her to get dizzy when she stands up and sometimes faint and causes lack of focus and pain. (Rec. Doc. 6-1, p. 46-47). She testified that she also suffers from dyslexia, anxiety, and depression. (Rec. Doc. 6-1, p. 47). She testified at the hearing that she was diagnosed with cubital tunnel syndrome, but she no longer has that problem. (Rec. Doc. 6-1, p. 48). She testified that she can dress and bathe on her own, and that sometimes she only bathes once a week because of

2

how much energy it takes. (Rec. Doc. 6-1, p. 48-49). The medical records in the record reveal the following pertinent history:

- In October 2015, when Claimant was 13, she presented to Dr. John Willis for dizziness. She had been treated for sinusitis and otitis media and dizziness a month earlier and had not attended school in the last month. She stated that she was dizzy in any body position and her dizziness never went away. She had seen an ENT with no diagnosis and had a normal MRI. She had no change in vision, though she felt dizzy and nauseous all the time. She also complained that she was unable to walk unless she held on to something. Dr. Willis's examination was normal. She appeared neurologically intact, and he could elicit no abnormalities on exam. "Despite saying she cannot walk without support, she was able to hop on one foot, run down the hall and do a normal tandem gait. There [was] not objective evidence of any neurological or vestibular dysfunction. Her complaints [we]re in fact all subjective," and he thought her symptoms were probably a stress reaction. (Rec. Doc. 6-1, p. 649-50).

- In August 2018, Claimant sprained her right ankle and completed physical therapy through December 2018. The physical therapy notes recorded no notes of dizziness, fatigue, or weakness. She performed functional activities (e.g. squatting, ascending/descending stairs, jogging, and jumping) without any noted POTS symptoms. (Rec. Doc. 6-1, p. 425-45). She had earlier that year sprained her left ankle. The treatment records do not evidence any complaints or notes regarding POTS symptoms. (Rec. Doc. 6-1, p. 452-55).

- Claimant saw Dr. Scott Macicek, pediatric cardiologist for POTS, which she had since September 2015 after having sinusitis and fluid in her ears. She had felt off balance ever since and experienced dizziness and nausea when sitting up or walking around too long. She first saw Dr. Macicek in November 2015 for POTS and annually thereafter. She was noted as homebound at that time, but Dr. Macicek wanted her reintegrated as quickly as possible. She saw him most recently in January 2019 noting dizziness about every 1.5 to 2 months (which Dr. Macicek described as "rarely"). She sat down when she felt dizzy and reported no syncope and good energy. She was no longer having racing episodes. Dr. Macicek recommended continued increased fluid and regular aerobic exercise. (Rec. Doc. 6-1, p. 609-17; 624-46).

3

- Claimant went to the emergency room several times in 2019. In February 2019 she presented for flu like symptoms and fatigue. She denied syncope and discharged instructions for acute URI, sinusitis. Her past medical history noted anemia and POTS. (Rec. Doc. 6-1, p. 342-44). In September 2019 she presented for cough and wheezing. She had a normal chest x-ray with no acute findings. (Rec. Doc. 6-1, p. 340-41).

- On August 15, 2019, Claimant presented to the emergency room as an obese girl with a history of anemia, POTS, dysmenorrhea and sinusitis complained of nausea, dizziness, and rapid heartbeat. She denied syncope, chest pain, and shortness of breath. She was then taking Fluonef. Her Pulmonary/chest exam was normal with no respiratory distress. She was treated with Zofran for nausea, given a liter of fluid, and discharged after an EKG demonstrated sinus tachycardia without signs of arrythmia, ACS or other abnormality. Blood tests were normal without electrolyte abnormalities and normal glucose. She was no longer tachycardic or orthostatic and her dizziness had improved. (Rec. Doc. 6-1, p. 350-62).

- In August 2019, Claimant was referred to Dr. Mary Younger-Rossi by her primary care doctor, Dr. Lindsay York, for obesity and noted family history of diabetes and thyroid problems. Physical exams were negative for fatigue, syncope, and weakness. Shad was diagnosed with mixed hyperlipidemia and dysmenorrhea and was advised of the risks for diabetes and hypertension and counseled on weight loss. Her obesity was noted as greater than/equal to 95% for her age. She noted that a lack of money made it difficult to choose healthy foods, because bad food is cheaper; however, a dietician counseled on ways to eat healthy for cheaper. (Rec. Doc. 6-1, p. 415-24).

- In October 2019, she saw Dr. Victor Ramirez at Children's Hospital Pulmonology for pertussis, reflux disease, and cough. The exam showed occasional wheeze and occasional rales, indicating pertussis consistent with diagnosis and treatment for GERD. (Rec. Doc. 6-1, p. 407-12).

- Claimant went to the emergency room in August 2020, after passing out for 35 seconds. She reported that she had passed out before but never for so long. After waking up, it took her some time to regain her sight and thoughts. She was discharged with an impression of POTS and syncope. (Rec. Doc. 6-1, p. 601-605).

4

- In August 2020, Claimant began seeing Dr. Shibu Varughese, who noted she had been diagnosed with POTS at 13. She had suffered a sinus infection, but her balance issues did not resolve thereafter. She had been taking Flourinef. She had intermittent symptoms over the prior year, including headache, cough, intermittent dizziness, epistaxis, and blood sugar ranging. She had been constantly drinking water. Her physical exam was essentially normal, with relevant assessments listed as POTS, obesity (BMI 38.02), chronic fatigue, sinus tachycardia, and polydipsia. In the next follow up visit, it was noted that she had seen an endocrinologist, but the work up was not clear. Labs had shown elevated insulin. She was well hydrated. Dr. Varughese stated that she should follow up with endocrinology and cardiology. Assessments were updated to include hypoglycemia due to endogenous hyperinsulinemia and "near syncope." By the next visit in October 2020, she was no longer assessed as "near syncope." In November 2020, Dr. Varughese continued to state that she should follow up with endocrine, but Claimant's mother insisted "cardiology has the answer." He referred her for endocrinology and cardiology for evaluation of POTS. She was taking Flourinef. (Rec. Doc. 6-1, p. 468-84).

- In January 2021, Dr. Varughese noted her history of POTS with persistent palpitations. She was being treated by cardiology and had switched from Flourinef to Atenolol. Her heart rate was elevated at that visit due to being sick with URTI. By the follow up in April 2021, she was under the care of Dr. Patricia Thomas and was doing better with Atenolol. Her heart rate and blood pressure were better, and her chronic fatigue was improving. (Rec. Doc. 6-1, p. 485-92).

- Claimant began seeing pediatric cardiologist Dr. Elizabet Thomas for POTS in February 2020. She had complaints of dizziness since September 2015 with sitting up or walking around too long. She had fluid in her ears, but after that resolved, she was still feeling off balance. She had been diagnosed with POTS and had taken Flourinef without significant benefit. She began taking Atenolol in November 2020, when she was complaining of high heart rate and dizziness. She had stopped school due to her symptoms. By May 2021, she had been doing well since switching to Atenolol, which seemed to be helping. The dosage was increased. Her blood pressure was going up, her heart was not racing, and she was able to do more exercise and recover faster. She was incorporating a lot more activity, including the elliptical and floor exercise, as well as walking around for 15-20 minutes. She denied syncope and had more good days than bad days. She was concerned with weight gain. She was

working on her GED. She was also wearing compression socks and had noticed significant improvement. Dr. Thomas recommended aerobic exercise with goal of working up to 30 minutes per day 4-5 days per week and then up to 1 hour per day.  (Rec. Doc. 6-1, p. 592-96).

- In July 2021, she presented to gastroenterology with food allergies, abdominal pain, and diarrhea ongoing for a few years. At that time she had normal rate, regular rhythm, and normal heart sounds. Her pulmonary exam was normal. She was referred for an allergist and instructed to continue taking antacids; however, she was later instructed to establish care with an adult GI doctor. (Rec. Doc. 6-1, p. 588). She later, in August 2021, saw Dr. Nina Hein with the allergy and immunology clinic for food allergies and rhinitis. She was 19 at the time. Dr. Hein suspected her symptoms were due to GERD, but she would evaluate for Celiac's, among other possibilities. Celiac's was later ruled out. (Rec. Doc. 6-1, p. 724-32).

- In June 2021 Claimant was screened at a behavioral health clinic for depression after she was emotionally abused by her sisters and diagnosed with POTS. She had quit school, was constantly tired, easily distracted, forgetful, and had difficulty sleeping, anxiety when interacting with new people. She could not take medication. In August 2021, Claimant telehealth visit with Kiana Andrew in a behavioral health clinic. She had a history of social anxiety disorder, MDD, and a history of verbal abuse. She was doing better, though she felt down and depressed at times. She reported low energy and lack of motivation. She was adamant about not returning to school and planned to get her GED. She indicated that she was not interested in medication or therapy. By the next month's session, she was depressed due her family having been displaced after a storm and was frustrated and depressed "a little bit." (Rec. Doc. 6-1, p. 698-720; 855-59).

- Dr. Amy Cavanaugh, psychologist provided a psychological report in December 2021 as part of a determination for disability. Claimant was capable of performing basic skills such as bathing, brushing, dressing, etc. She needed assistance with transportation, managing money, remembering to take medication, and remembering appointments. Since she had started Atenolol, her POTS was more manageable, and she was able to do daily things. Seasonal allergies sometimes caused problems with her POTS. She claimed to have dyslexia, dyscalculia, and anxiety for which she had not taken medication due to POTS. She reported worrying and not sleeping. She had been able to manage her dyslexia and dyscalculia with extra help at school and was a

6

straight A student. After having missed two years of school due to POTS, she had dropped out of school in the 9th grade due to POTS when her medicine stopped working. She was pursuing her GED. Testing revealed that she had an average IQ. Dr. Cavanaugh concluded that Claimant is capable of understanding, remembering, and carrying out simple oral instructions. Her ability to sustain concentration, to perform simple tasks, and to relate to others were normal. From a psychological perspective, Dr. Cavanaugh opined that Claimant's mental impairments would not preclude her from focusing or sustaining concentration, pace, persistence when performing simple and familiar tasks for extended periods. She appeared capable of managing her personal financial affairs. (Rec. Doc. 6-1, p. 877-80).

- Claimant began seeing Dr. David Tadin with Cardiovascular Institute of the South in December 2021 for fatigue, palpitations, and occasional dizziness due to POTS. She was doing well with no complaints. She was compliant with liberal fluid and salt intake, though she was not sleeping with the head of the bed at 30 degrees due to her arrangements. She was 5'5" and 257 pounds and noted as morbidly obese. She was taking Atenolol and was to follow up bi-annually. (Rec. Doc. 6-1, p. 882-84).

- Claimant began seeing counselor Jamie Simmons with Dr. Joseph Tyler, Jr. Behavioral Health Clinic in May 2022 for "anxiety and depression because of POTS." She reported lack of energy, memory loss, inability to concentrate and focus. She claimed she was stuck in bed a lot and that POTS left her dizzy, in pain, fatigued, and with a brain fog. She had sleep problems, hygiene issues, forgetfulness, and anxiety. She began taking Zoloft, but soon stopped taking it, because she reported "it was messing with [her] POTS." By the next session in August 2022, she reported crying around graduation season, because she would have been graduating if not for POTS. She stated that her anxiety had been between severe and moderate due to a diagnosis of carpal tunnel, for which she would need surgery, and her mother had recently been diagnosed with cancer. She also apparently had PTSD, though her social anxiety had improved. Her diagnoses included generalized anxiety disorder, depression, PTSD, and social anxiety. (Rec. Doc. 6-1, p. 925-51; 1008).

- From February through July 2022, Claimant saw Dr. Veeramachineni, with Pediatric Group of Acadiana for hand numbness and occasional sharp pains, with occasional dropping of things. She also noted some pain and numbness in her legs. She was listed as Obesity Class III (severe, BMI 40+). She was to take ibuprofen and gabapentin as needed. A nerve conduction study revealed

7

mild to moderate bilateral median neuropathy, and she was referred to orthopedics. (Rec. Doc. 6-1, p. 962-63). She saw Dr. Meghan Richli at Ochsner in September 2022 for moderate bilateral carpal tunnel syndrome, right ulnar neuropathy at the wrist, and sensory motor neuropathy. Because her symptoms were somewhat mild, they planned to manage conservatively with recommendations for neuropathic pain meds and behavior modification. She was encouraged to follow up with her primary doctor for a spine workup given positive exam findings for cervical radiculopathy and sensory motor polyneuropathy. (Rec. Doc. 6-1, p. 982-85). She later testified at the October 2023 hearing that her carpal tunnel symptoms had improved. (Rec. Doc. 6-1, p. 48).

- In her September 2022 counseling session, Claimant reported that she would not need surgery for carpal tunnel, but she had pain in her neck, spine, and legs for which she was to see a neurologist. She had been having anxiety due to her mother's health concerns. She was managing anxiety with breathing, and she had not had any exacerbation with social anxiety or panic attacks. In her November 2022 session, she presented with a jumpy leg and blunted affect. She was anxious over her dad's health issues, financial issues, and her being in a lot of physical pain. She reported her POTS was getting worse, her pain medicine did not work like it should, and she did not want to rely on medication too much since addiction ran in her family. She stated that she still had to lie down a lot to control her blood flow and that she needed enough blood to go to her brain so it could function properly. Her December 2022 session was similar, with her noting her POTS had been exacerbated by current life stressors. She was lying down to alleviate her POTS symptoms. (Rec. Doc. 6-1, p. 1019-24). Claimant testified at the October 2023 hearing that she was no longer seeing a counselor because of scheduling problems and that her counselor "didn't really want to be [her] counselor anymore." (Rec. Doc. 6-1, p. 48).

- A December 20, 2022, disability determination reconsideration report by Dr. Johnny Craig affirmed an earlier determination by Dr. Timothy Honigman that Claimant was not disabled. Notably, Dr. Craig applied a framework for sedentary limitations in assessing Claimant. Dr. Honigman recommended hazard precautions only due to dizziness associated with POTS. (Rec. Doc. 6-1, p. 73). On reconsideration, Dr. Craig assessed her RFC with manipulative and environmental limitations along with POTS precaution. (Rec. Doc. 6-1, p. 76-84). Reviewing psychologists for social security concluded that,

8

although Claimant established some mental impairments, her symptoms did not cause moderate or marked limitations. (Rec. Doc. 6-1, p. 71; 74).

- At her most recent cardiologist visit in December 2022, Claimant complained of worsened fatigue, palpitations, and occasional dizziness which was worse when she did a lot. She was 257 pounds. Dr. Tadin's assessment was POTS, with a note that "orthostatics were fine," HLD and morbid obesity. She was to continue liberal fluid and salt intake, sleep with the head of the bed at 45 degrees and continue compression stockings. She was given a prescription for waist high compression stockings graded at 15 to 20 mmHg and a prescription for a wheelchair because of limited mobility due to POTS. (Rec. Doc. 6-1, p. 1026-29).

After considering Claimant's medical records and testimony, the ALJ found that Claimant was not disabled, because she is capable of performing light work, subject to certain limitations, and that significant number of qualifying jobs were available. Claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A. Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

## B. **Entitlement to Benefits**

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. § 423(a). See also *Smith v.*

*Berryhill*, 139 S.Ct. 1865, 1772 (2019). Supplemental Security Income SSI provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2). See also *Smith v. Berryhill*, 139 S.Ct. at 1772. A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

### C. **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled. The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do

the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th

Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

### D. The ALJ's Findings and Conclusions

The ALJ determined at step one that Claimant has not engaged in substantial gainful activity since the date of alleged disability onset. (Rec. Doc. 6-1, p. 19). This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Claimant has the following severe impairments: postural orthostatic tachycardia syndrome, anemia, depressive disorder, anxiety disorder, and dyslexia. (Rec. Doc. 6-1, p. 19). This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Rec. Doc. 6-1, p. 19). Claimant does not challenge this finding.

The ALJ found that Claimant is capable of performing light work, except that she can never work at unprotected heights or around moving machinery; cannot drive; is limited to simple, routine, and repetitive work with one, two or three step instructions in a work environment free of any fast-paced production requirements and involving only simple work-related decisions with few, if any, workplace changes. (Rec. Doc. 6-1, p. 21). Claimant challenges this finding.

At step four, the ALJ found Claimant has no past relevant work. (Rec. Doc. 6-1, p. 26). Claimant does not challenge this finding.

At step five, the ALJ found that, considering Claimant's education, work experience, and residual functional capacity, a significant number of qualifying jobs existed in the national economy. (Rec. Doc. 6-1, p. 27). Claimant challenges this finding.

### E. The Allegations of Error

Claimant alleges the ALJ erred in formulating an overestimated residual functional capacity (RFC). Claimant also challenges the vocational expert's opinion to the extent the ALJ did not provide a rational basis for the opinion.

### F. Whether the ALJ's RFC finding is supported by substantial evidence.

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations. *Martinez v. Chater*, 64 F.3d at 176. The evaluation of a claimant's

subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983). In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

Claimant challenges the ALJ's RFC finding for failing to include limitations for avoidance of ladders, scaffolds, ropes, fumes, odors, gases, dust, and poor ventilation. Claimant also maintains that the ALJ failed to consider her testimony about the effects of POTS on her ability to perform light duty work. The Court agrees that the ALJ's RFC finding is not supported by medical evidence.

The medical evidence supports that Claimant has occasionally suffered from sinusitis and has taken medicine for seasonal allergy symptoms (e.g. Rec. Doc. 6-1, p. 340-44; 407-12; 468-92); however, the ALJ correctly classified these medical conditions as non-severe. There is no medical evidence that these conditions caused any functional limitations. Accordingly, the ALJ did not err in failing to consider restrictions for exposure to fumes, poor ventilation, etc.

The same cannot be said of the ALJ's failure to consider restrictions for avoidance of ropes, scaffolds, ladders, and other restrictions to account for occasional dizziness and POTS symptoms. The medical evidence supports Claimant suffered from POTS symptoms since she was thirteen and that these symptoms improved with medication, particularly Atenolol. Although Claimant complained of ongoing POTS issues most recently in December 2022, the medical evidence suggests that medication, aerobic exercise, and compression stockings could improve her symptoms and her functional abilities as these remedies had been successful in the past. (See e.g. Rec. Doc. 6-1, p. 592-96; 609-17; 624-46). Nevertheless, the Court agrees that the ALJ erroneously ignored the effects of her POTS condition in assessing the RFC. Even the disability determination reviewers used a sedentary framework to assess Claimant's work capacity. (Rec. Doc. 6-1, p. 84; 95). Further, Claimant persuasively argues that the ALJ's light duty assessment and the vocational expert's identification of qualifying jobs of housekeeper, price marker, and hand packager fail to consider Claimant's POTS issues arising from frequent postural changes. Accordingly, the Court finds that the matter should be remanded for reconsideration of Claimant's RFC. Because the ALJ shall re-assess Claimant's RFC, the Court declines to consider Claimant's second allegation of error pertaining to the basis of the vocational expert's opinion. A re-assessed RFC necessarily affects the expert's opinion.

## **Conclusion and Recommendation**

For the foregoing reasons, the Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to re-evaluate Claimant's residual functional capacity, whether the claimant is capable of performing sedentary work with restrictions accounting for POTS, and whether she is disabled. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[1]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by

---

[1] See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[2]

Signed in Lafayette, Louisiana, this 25th day of September, 2024.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE

---

[2] See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).